UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANGELA R. SANFORD,                    Case No. 5:13-CV-15167

       Plaintiff,                    Honorable Judith E. Levy
                                       Magistrate David R. Grand

v.


DELOITTE, LLP a/k/a
  DELOITTE & TOUCHE USA LLP,
  a/k/a DELOITTE & TOUCHE LLP,

       Defendant.
_____/

<table>
<tr><td>

Alice B. Jennings (P29064)<br>
EDWARDS & JENNINGS, PC<br>
65 Cadillac Square, Suite 2710<br>
Detroit, MI 48226<br>
(313) 961-5000<br>
ajennings@edwardsjennings.com<br><br>

Felicia Duncan Brock (P63352)<br>
I.A.B. ATTORNEYS AT LAW, PLLC<br>
25447 Plymouth Road<br>
Redford, MI 48239<br>
(313) 318-3180<br>
Duncan@iabattorneys.com<br><br>

*Attorneys for Plaintiff*

</td><td>

Elizabeth Hardy (P37426)<br>
Thomas J. Davis (P78626)<br>
KIENBAUM OPPERWALL<br>
  HARDY & PELTON, P.L.C.<br>
280 N. Old Woodward Avenue<br>
Suite 400<br>
Birmingham, MI 48009<br>
(248) 645-0000<br>
ehardy@kohp.com<br>
tdavis@kohp.com<br><br>

*Attorneys for Defendant*

</td></tr>
</table>

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Deloitte LLP,[1] by its attorneys, Kienbaum Opperwall Hardy & Pelton, P.L.C., moves under Fed.R.Civ.P. 56(c) for an order granting summary judgment on Plaintiff's claims.

In support of its motion, Deloitte LLP states:

1.     Plaintiff's Third Amended Complaint was filed on August 29, 2014 (Dkt. 25.)

2.     For the reasons set forth in the accompanying brief, there is no genuine dispute as to any material fact arising out of the claims there stated, and Deloitte LLP is entitled to judgment as a matter of law.

3.     Concurrence in the relief sought herein was requested and was denied, necessitating the bringing of this motion.

WHEREFORE, Deloitte LLP requests that the Court grant summary judgment on all counts of Plaintiff's Third Amended Complaint.

---

[1] Plaintiff's Third Amended Complaint names "Deloitte LLP a/k/a Deloitte & Touche USA LLP, a/k/a Deloitte & Touche LLP" as the defendant. In fact, Deloitte LLP is the parent company of Deloitte & Touche LLP, and there is no entity affiliated with Deloitte LLP named "Deloitte & Touche USA LLP."

KIENBAUM OPPERWALL HARDY
  & PELTON, P.L.C.

By:/s/Thomas J. Davis
    Elizabeth Hardy (P37426)
    Thomas J. Davis (P78626)
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@kohp.com
Dated: March 27, 2015     tdavis@kohp.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANGELA R. SANFORD,                         Case No. 5:13-CV-15167

        Plaintiff,                      Honorable Judith E. Levy
                                           Magistrate David R. Grand

v.

DELOITTE, LLP a/k/a
  DELOITTE & TOUCHE USA LLP,
  a/k/a DELOITTE & TOUCHE LLP,

        Defendant.
_____/

Alice B. Jennings (P29064)            Elizabeth Hardy (P37426)
EDWARDS & JENNINGS, PC                Thomas J. Davis (P78626)
65 Cadillac Square, Suite 2710       KIENBAUM OPPERWALL
Detroit, MI 48226                       HARDY & PELTON, P.L.C.
(313) 961-5000                        280 N. Old Woodward Avenue
ajennings@edwardsjennings.com        Suite 400
                                     Birmingham, MI 48009
Felicia Duncan Brock (P63352)        (248) 645-0000
I.A.B. ATTORNEYS AT LAW, PLLC        ehardy@kohp.com
25447 Plymouth Road                  tdavis@kohp.com
Redford, MI 48239
(313) 318-3180                       *Attorneys for Defendant*
Duncan@iabattorneys.com


*Attorneys for Plaintiff*
_____/

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## CONCISE STATEMENT OF ISSUE PRESENTED

Whether the Court should grant summary judgment to Defendant Deloitte LLP on all claims?

# TABLE OF CONTENTS

CONCISE STATEMENT OF ISSUE PRESENTED.................................................. i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ...........................................................................1

BACKGROUND ............................................................................1

    A.    Deloitte & Touche's Audit Practice and Hiring
        Procedures ...................................................................1

        1.    Experienced Auditor Hiring........................................2

        2.    Entry-Level Auditor Hiring ........................................2

    B.    Plaintiff's Job Applications With Deloitte............................5

        1.    Plaintiff Applied for Two Experienced-Hire
            Positions in 2011 For Which She is Not Qualified....................5

        2.    Plaintiff Applied as an Entry-Level Candidate in
            August 2012 ..................................................6

STANDARD OF REVIEW ..................................................................10

ARGUMENT ..............................................................................11

I.    ANY CLAIMS ARISING OUT OF PLAINTIFF'S
    APPLICATIONS FOR EXPERIENCED AUDIT POSITIONS
    IN 2011 ARE INVALID. ..............................................................11

II.    PLAINTIFF'S CLAIMS REGARDING THE OCTOBER 2012
    ENTRY-LEVEL HIRING DECISION FAIL AS A MATTER
    OF LAW ...........................................................................13

    A.    Plaintiff Has No Direct Evidence of Discrimination ...........................13

    B.    Plaintiff Has No Circumstantial Evidence of Discrimination..............17

    1.    Deloitte's Selection of Candidates Based on Interview Scores is a Legitimate, Non-Discriminatory Practice ............................................................17

    2.    Plaintiff Has No Evidence that Deloitte's Interview Scoring Is False and Pretext for Discrimination......................20

CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................... 10, 11

*Back v. Nestle U.S.A.*,
  694 F.3d 571 (6th Cir. 2012) .................................................. 14, 15, 16

*Bender v. Hecht's Dep't Stores*,
  455 F.3d 612 (6th Cir. 2006) ......................................................... 22, 24

*Bondurant v. Air Line Pilots Ass'n, Int'l*,
  679 F.3d 386 (6th Cir. 2012) ................................................................11

*Browning v. Dep't of Army*,
  436 F.3d 692 (6th Cir. 2006) ...............................................................18

*Doster v. Harvey*,
  2005 WL 3501410 (E.D. Mich. Dec. 21, 2005) ...................................18

*Grosjean v. First Energy Corp.*,
  349 F3d 332 (6th Cir. 2003) ................................................................17

*Hazle v. Ford Motor Co.*,
  628 N.W.2d 515 (2001) .......................................................................11

*Hopkins v. Canton City Bd. of Educ.*,
  477 F. App'x 349 (6th Cir. 2012) .........................................................25

*Hopson v. DaimlerChrysler Corp.*,
  306 F.3d 427 (6th Cir. 2002) ...............................................................24

*Johnson v. N.W. Airlines*,
  No. 94–1076, 1995 WL 242001 (6th Cir. Apr. 24, 1995) ....................12

*Letner v. Wal-Mart Discount Dep't Store*,
  172 F.3d 873, 1999 WL 68766 (6th Cir. 1999) ........................... 13, 17

*Ortiz v. Hershey Co.*,
  580 F. App'x 352 (6th Cir. 2014) .........................................................17

*Reid v. Mich. Dep't of Corr.*,
　　101 F. App'x 116 (6th Cir. 2004)..........................................................18

*Schoonmaker v. Spartan Graphics Leasing*,
　　595 F.3d 261 (6th Cir. 2010).................................................................22

*Simpson v. Beaver Dam Cmty. Hosps., Inc.*,
　　No. 14-2269, 2015 WL 1046733 (7th Cir. Mar. 11, 2015)...................14

*Spaeth v. Georgetown Univ.*,
　　943 F. Supp. 2d 198 (D.D.C. 2013) ......................................................22

*Sutherland v. Mich. Dep't of Treasury*,
　　344 F.3d 603 (6th Cir. 2003)......................................................... 17, 19

*Trapp v. TSS Techs., Inc.*,
　　485 F. App'x 757 (6th Cir. 2012)..........................................................21

*Weigel v. Baptist Hosp. of E. Tenn.*,
　　302 F.3d 367 (6th Cir. 2002).................................................................14

*White v. Columbus Metro. Hous. Auth.*,
　　429 F.3d 232 (6th Cir. 2005).................................................................16

*Wiley v. United States*,
　　20 F.3d 222 (6th Cir. 1994)...................................................................14

*Williams v. Hevi-Duty Elec. Co.*,
　　819 F.2d 620 (6th Cir. 1987)......................................................... 11, 12

*Wooden v. Bd. of Educ. of Jefferson Cnty., Ky.*,
　　931 F.2d 376 (6th Cir. 1991)......................................................... 11, 12

*Woodman v. WWOR-TV, Inc.*,
　　411 F.3d 69 (2d Cir. 2005) ........................................................... 12, 17

*Wrenn v. Gould*,
　　808 F.2d 493 (6th Cir.1987)..................................................................21

**Statutes**

MCL §339.725 ........................................................................................3, 5

**Rules**

Fed.R.Civ.P. 56 .................................................................................................10

FRE 801(d)(2)(D) ........................................................................................ 15, 16

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Back v. Nestle U.S.A.*, 694 F.3d 571 (6th Cir. 2012)

*Bender v. Hecht's Dep't Stores*, 455 F.3d 612 (6th Cir. 2006)

*Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386 (6th Cir. 2012)

*Brown v. Packaging Corp. of Am.*, 338 F.3d 586 (6th Cir. 2003)

*Browning v. Dep't of Army*, 436 F.3d 692 (6th Cir. 2006)

*Grosjean v. First Energy Corp.*, 349 F3d 332 (6th Cir. 2003)

*Hazle v. Ford Motor Co.*, 628 N.W.2d 515 (2001)

*Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002)

*Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349 (6th Cir. 2012)

*Johnson v. N.W. Airlines*, No. 94–1076, 1995 WL 242001 (6th Cir. Apr. 24, 1995)

*Letner v. Wal-Mart Discount Dep't Store*, 1999 WL 68766 (6th Cir. 1999)

*Ortiz v. Hershey Co.*, 580 F. App'x 352 (6th Cir. 2014)

*Reid v. Mich. Dep't of Corr.*, 101 F. App'x 116 (6th Cir. 2004)

*Schoonmaker v. Spartan Graphics Leasing*, 595 F.3d 261 (6th Cir. 2010)

*Simpson v. Beaver Dam Cmty. Hosps., Inc.*, No. 14-2269, 2015 WL 1046733 (7th Cir. Mar. 11, 2015)

*Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603 (6th Cir. 2003)

*Trapp v. TSS Techs., Inc.*, 485 F. App'x 757 (6th Cir. 2012)

*Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367 (6th Cir. 2002)

*Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994)

*Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620 (6th Cir. 1987)

*Wooden v. Bd. of Educ. of Jefferson Cnty., Ky.*, 931 F.2d 376 (6th Cir. 1991)

*Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987)

**INTRODUCTION**

Public accounting is not bookkeeping. It is a professional service that requires the auditing of a client's financial information in order to render an opinion regarding the reliability and accuracy of the client's financial statements. Auditing requires records investigations, client interviews, and the testing and evaluation of a client's financial controls, policies, and procedures. A successful auditor must therefore have more than knowledge of accounting principles. An auditor must also be a leader, display sound judgment, have strong interpersonal and communication skills, and be able to work in a team.

In 2012, Plaintiff was one of fifty-two candidates for ten entry-level positions at Deloitte's Detroit office. Like the other candidates, she had paper qualifications, but she fell short in the interviews designed to gauge the job's other required competencies. The candidates with the best interview scores received offers. Deloitte's use of interviews to select candidates from a strong applicant pool is not discriminatory, and Plaintiff has no evidence of discrimination in Deloitte's hiring practices. Summary judgment should be granted on all claims.

**BACKGROUND**

**A.      Deloitte & Touche's Audit Practice and Hiring Procedures.**

Deloitte & Touche LLP ("Deloitte") is one of the "Big Four" accounting firms, and serves sophisticated clients—many of whom are publicly-traded

-1-

corporations subject to complex regulations. (Ex. 1, Donovan Decl. ¶ 3.) These clients pay premium rates for Deloitte's services, and have high expectations of Deloitte's auditors. (*Id.*) Thus, Deloitte's auditors must have a strong academic and conceptual understanding of accounting—but they must also possess "soft skills" such as strong communication skills, judgment, and teamwork. (*Id.* ¶¶ 4-5.)

Deloitte's auditors must display these soft skills immediately upon starting the job. Entry-level auditors work at a client site almost daily, and serve as the primary point of contact for a client's lower and middle management. (*Id.* ¶ 6.) Entry-level auditors must perform in-depth interviews of client employees—who are often not forthcoming or offer pushback—and must observe, test, and evaluate the efficacy of a client's internal controls. (*Id.*)

1.    **Experienced Auditor Hiring.** Deloitte seeks experienced auditors through job openings posted online. (Ex. 2, Omo Decl. ¶ 3) An experienced-hire recruiter receives submitted resumes, and forwards the resumes to talent managers who screen the resumes for minimum qualifications. (*Id.* ¶ 4.) As relevant to this case, if a candidate's resume does not reflect the minimum qualifications, the process ends there and no further action is taken. (*Id.*)

2.    **Entry-Level Auditor Hiring.** Deloitte also recruits entry-level audit candidates from several Michigan colleges—including, in 2012, Walsh College. (Ex. 3, Mathis Decl. ¶ 3.) The job description for the entry-level audit position lists

academic qualifications—a GPA of 3.0 or higher, relevant work experiences like internships or summer jobs, and the ability to sit for the CPA exam prior to starting full-time employment.[2] (Ex. 4, Tab C.) It also identifies as qualifications several soft skills, including "[d]emonstrated leadership, problem solving, and strong verbal and written communication skills" and the "[a]bility to work both independently and as part of a team with professionals at all levels." (*Id.*)

Deloitte's campus recruiter screens the student resumes for "paper" qualifications like GPA. (Ex. 5, Upshaw Dep. 29-31.) Candidates who meet these requirements and who have demonstrated interest in Deloitte are selected for an on-campus interview. (*Id.*) After the day's interviews, the campus recruiter identifies how many candidates may be advanced to a second round of interviews at the Detroit office, and the interviewers select the candidates who will advance. (Ex. 6, Hilliard Dep. 43:11-15.)

Second-round interviews take place throughout October. (Ex. 3 ¶ 7.) Candidates come to the Detroit office for a series of three half-hour interviews, each with a Deloitte employee at the audit manager level or higher. (Ex. 5 at 43:2-4.) The candidates also have lunch with a "lunch buddy," who is a lower-level auditor. (*Id.* at 87-89.) Before the interviews, the recruiting coordinator sends the

---

[2] In Michigan, the requirements to take the CPA exam include the completion of 150 credit hours of college education, and the possession of a bachelor's or higher degree in accounting. MCL §339.725(1)(e), (2).

interviewers the candidates' resumes, candidate interview assessments forms on which to take notes, and suggested behavioral-based questions. (Ex. 4, Tab E; Ex. 5 at 49:6-9, 76-77.) Behavioral questions seek to elicit information about the candidates' past performances, so that the interviewer can determine whether the candidate has displayed judgment, strong communication skills, effective teamwork, or other required soft skills. (Ex. 1 ¶¶ 5, 7-9; Ex. 5 at 43, 83; Ex. 17 ¶ 4.) Because all the candidates who advance to the second round have "paper" qualifications, the candidates' interview performances determine who receives offers. (Ex. 1 ¶ 5; Ex. 5 at 81-83; Ex. 7, Fischer Dep. at 66-69, 80-82; Ex. 9, Stevenson Dep. 13-15, 38, 114.)

Immediately following the three interview sessions, the interviewers go to a "consensus meeting" with recruiting staff. (Ex. 6 at 55-64; Ex. 10, Wahrman Dep. 28) During the meeting, the interviewers rate each of their candidates as a 1, 2, or 3—with 1 being best.[3] (Ex. 5 at 90-97; Ex. 7 at 70-73; Ex. 9 at 92; Ex. 10 at 49.) The recruiter puts the scores into a spreadsheet, and combines each candidate's individual scores to reach a final number. (*Id.*) Hiring decisions are based on interview performance; generally, perfect-scoring candidates are given offers quickly, while candidates with good scores are discussed but often have their offer

---

[3] The "lunch buddy" is not part of the consensus meeting and does not provide a numerical ranking. (Ex. 6 at 60; Ex. 7 at 74-75.) The lunch buddy's evaluation is only reviewed, if at all, for candidates whose interview scores place them "on the bubble" between receiving an offer or not. (*Id.*; Ex. 5 at 88-89.)

decisions deferred until other candidates are interviewed at subsequent sessions. (Ex. 5 at 87, 96-97; Ex. 6 at 61-63; Ex. 9 at 96-97; Ex. 10 at 49.)

### B.   Plaintiff's Job Applications With Deloitte.

Plaintiff graduated from Walsh College in December 2009. Since then, her public accounting experience has been limited to a four-month internship at Andrews Hooper Pavlik PLC and one week at Kessler CPA, in both cases doing tax work. (Ex. 11, Pl's Dep. 36, 72, 84-86, 92-93; Ex. 12.) In June 2010, she began work as an accountant for Benesys, which is not a public accounting firm. (Ex. 11 at 51, 90, 92.) She obtained her CPA license in January 2011.[4] (Ex. 13). Since then, Plaintiff has applied for three audit positions with Deloitte: Senior Audit Consultant (2011), Senior Audit Assistant (2011), and Audit Assistant (2012).

### 1.   Plaintiff Applied for Two Experienced-Hire Positions in 2011 For Which She is Not Qualified. In 2011, Deloitte posted job openings for Audit Senior Assistants and Audit Senior Consultants. The Senior Assistant job required one year of experience in public accounting; the Senior Consultant job required three years of public accounting experience. (Ex. 2 ¶¶ 6-7; Ex. 4, Tabs A, B.)

---

[4] Michigan's requirements to obtain a CPA license are 150 hours of college credit with a concentration in accounting, passage of the CPA exam, and one year of "qualified experience." MCL § 339.725(1)-(4). That qualified experience once required work in a public accounting firm, but now may be satisfied by other experience such as the preparation of income tax returns. *Id.* § 339.725(4). Plaintiff was thus able to obtain her qualified experience despite having less than one year with a public accounting firm. (Ex. 14 at 39-40.)

The postings drew a large number of candidates, including Plaintiff. (Ex. 2. ¶ 3; Ex. 3 ¶ 13.) Experienced-hire recruiter Nate Gambill sent Plaintiff's resume to Marcella Omo and Traci Verlinde for screening. (Ex. 2 ¶ 5; Ex. 8, Verlinde Decl. ¶ 4.) Plaintiff's resume did not disclose her race or her age. (Ex. 2, ¶ 8; Ex. 4, Tab D; Ex. 8, ¶ 7.) The resume also did not reflect auditing experience or the minimum public accounting experience required for the jobs. (Ex. 2 ¶ 7; Ex. 8 ¶ 6.) Plaintiff was thus not qualified for the jobs. (*Id.*) The Detroit office hired one man and one woman as Senior Consultants; it hired three men and two women as Senior Assistants. (Ex. 4 ¶¶ 4-5.)

**2.      Plaintiff Applied as an Entry-Level Candidate in August 2012.** In August 2012, Plaintiff e-mailed her resume to Arica Harris—an African-American Enterprise Risk Services manager in Deloitte's St. Louis office who shared a mutual friend with Plaintiff—seeking an experienced-hire position. (Ex. 11 at 111-12; Ex. 14; Ex. 15, Harris Dep. 9-12, 90-91.) Harris forwarded Plaintiff's resume to Detroit's African-American campus recruiter LaDonna Upshaw. (*Id.*; Ex. 5 at 6) Upshaw talked with recruiter Nate Gambill, who said that Plaintiff's experience was better suited to an entry-level, rather than experienced, job. (Ex. 5 at 25-27.)

Plaintiff then applied through Walsh for an entry-level position during the Fall 2012 recruiting season. (Ex. 11 at 109-11, 124.) She was selected for an interview, and in early October 2012 she was interviewed by audit manager Scott

Hilliard. (Ex. 6 at 14-15, 42-43 & Ex. 4, Tab F.) Following the interviews, Upshaw told Hilliard how many candidates could be advanced to second-round interviews in Detroit, and Hilliard chose Plaintiff and one other candidate. (*Id.*)

Plaintiff's second-round interview session was on the afternoon of October 16. (Ex. 4, Tab G at 518.) She first participated in a group meeting, and then she and another candidate were taken to lunch by their "lunch buddy," Audit Senior Michael Pangrazzi. (Ex. 11 at 163-68.) Neither Pangrazzi nor the other candidate said anything during lunch that Plaintiff has a complaint about. (*Id.* at 168.)

Plaintiff's first interview on October 16 was with Audit Manager Leslie Fischer. Fischer performed a behavioral interview of Plaintiff, but she does not recall the specific questions she asked. (Ex. 7 at 35-36, 62.) Fischer believed that the conversation with Plaintiff was forced and did not flow well, and that there was an uncomfortable lag time between her questions and Plaintiff's answers. (*Id.* at 61-63 & Ex. 4, Tab H.) Fischer also thought that Plaintiff's answers were not strong or specific. (*Id.*; Ex. 16 ¶¶ 3-5.) Fischer felt that based on Plaintiff's interview performance, she was not a strong candidate for an offer. (Ex. 7 at 61.) At the consensus meeting, she gave Plaintiff a "3." (Ex. 4, Tab I; Ex. 7 at 73.)

Plaintiff was unable to offer many details about this interview, except that she mentioned her "credentials," "experience," and some of her job responsibilities at Benesys. (Ex. 11 at 175-80.) Plaintiff said that she did not volunteer certain

-7-

details about her job experiences because she was not specifically asked (*id.* at 176:3-10; 179:6-9; 180:8-11). Plaintiff had no problems with Fischer's tone, questions, comments, or any other aspect of the interview. (*Id.* at 180.)

Plaintiff's next interview on October 16 was with partner Julie Wahrman. Wahrman asked Plaintiff behavioral questions regarding her past work experiences, although she does not recall the specific questions. (Ex. 10 at 47; Ex. 17 ¶¶ 4-5.) Wahrman recalls that while Plaintiff was able to answer her questions, the answers were short and not very detailed, and the two of them did not have a robust, back-and-forth conversation. (Ex. 17 ¶ 5.) Wahrman also felt that Plaintiff was reserved, and that she did not frequently make eye contact, smile, or show enthusiasm for the job. (*Id.*) Wahrman gave Plaintiff a score of "2" reflecting a mixed performance: Plaintiff was able to relate some of her experiences to the audit job, but she did not display the strong oral communications skills needed by an entry-level auditor. (*Id.* ¶ 6; Ex. 4, Tab I.)

Plaintiff stated that she discussed with Wahrman her credentials as reflected in her resume, and a policy change she suggested at Benesys that had been adopted. (Ex. 11 at 180-182, 184-187, 286-87). Plaintiff had no complaints about how Wahrman conducted herself during the interview. (*Id.* at 186:18-23.)

Finally, Plaintiff interviewed with partner Brad Stevenson. Although Stevenson could not recall the specific questions from the interview, he asks

candidates behavioral questions in an effort to judge, among other things, their communication, teamwork, and confidence—all skills that are needed when working with a client facing difficult issues. (Ex. 9 at 13-15, 61-62, 87-88, 101-03; Ex. 18 ¶¶ 4, 7.) Stevenson also expected candidates to take the initiative to research details about Deloitte's practice prior to the interview and demonstrate in the interview that they had a specific interest in Deloitte. (Ex. 9 at 14-15, 59-60, 103.)

Stevenson felt that his conversation with Plaintiff did not flow easily. He had to ask her questions to drive the conversation, and her answers were short and not well-articulated. (*Id.* at 15, 23, 26.) Plaintiff's questions to him seemed scripted, as if they had come from an Internet search, and he felt that she had not done much research on Deloitte or the audit position she was applying for. (*Id.* at 23, 25-26, 60-62, 73 & Ex. 4, Tab J.) Stevenson's impression was that Plaintiff "stated all her work is done independently – no group work, no client interactions." (Ex. 4, Tab J.) Stevenson did not believe Plaintiff was a strong candidate for an offer, and gave Plaintiff a rating of "3" at the consensus meeting. (Ex. 9 at 109-110; Ex. 4, Tab I.)

Plaintiff confirmed telling Stevenson that she worked independently with little client interaction. (Ex. 11 at 185:9-18, 291-93.) She also said that Stevenson asked her to discuss a time when she had to deal with a difficult teammate, and that she responded with an example of her failure to convince a classmate to contribute to a group project. (*Id.* at 188-191.) She also recalled discussing resolving a tax

issues at Benesys, a time she obtained a refund, and the policy issue she discussed with Wahrman. (*Id.* at 201-03, 284-87, 290, 303-04.) Plaintiff had no complaints about Stevenson's questions or conduct during the interview. (*Id.* at 188:15-17.)

Fifty-two candidates for the entry-level audit position participated in the Detroit office interviews—a number significantly higher than the positions to be filled, as was Deloitte's historical practice. (Ex. 1 ¶ 5; Ex. 5 at 64:6-9.) Ultimately, all of the candidates for the audit position with aggregate interview scores of 3 or 4 were given offers. (Ex. 4, Tab I.) Ten candidates accepted offers to join the Detroit Audit Practice: five men and five women, of a mix of races (including an African-American woman). (Ex. 4, Tab M at 898-947; Ex. 19.) Plaintiff's aggregate score was an 8, and no one with an aggregate score of 5 through 9 received an offer in the Audit Practice.[5]

## STANDARD OF REVIEW

Summary judgment is proper if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (a), (c). A "genuine" dispute is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw inferences in the light most

---

[5] Ko Yamamoto had an aggregate score of 6; however, he was offered a job in the Japanese Service Group, not the Audit Practice. (Ex 4, Tab I & Tab M at 893; Ex. 9 at 100.). The JSG position requires candidates to be fluent in both Japanese and English; Plaintiff does not speak Japanese. (Ex. 8 ¶ 8; Ex. 23.)

favorable to the opposing party, but "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is "insufficient." *Id.* at 251-52.

## ARGUMENT

Absent direct evidence of discrimination, Title VII, ADEA, and ELCRA hiring claims all proceed under the *McDonnell Douglas* method of proof. The plaintiff must first establish a *prima facie* case by showing that she was qualified for a job, was rejected, and that the job went to another person under circumstances giving rise to an inference of discrimination. The defendant must then give a legitimate, non-discriminatory reason for the employment decision, after which the burden shifts back to the plaintiff to show that the proffered reason is pretext for unlawful discrimination. *Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620, 629 (6th Cir. 1987) (Title VII); *see also Wooden v. Bd. of Educ. of Jefferson Cnty., Ky.*, 931 F.2d 376, 378 (6th Cir. 1991) (ADEA); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (2001) (ELCRA). For ADEA and ELCRA age-discrimination claims, the plaintiff must prove that age was the "but-for cause" of the adverse action. *Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 394 (6th Cir. 2012).

## I. ANY CLAIMS ARISING OUT OF PLAINTIFF'S APPLICATIONS FOR EXPERIENCED AUDIT POSITIONS IN 2011 ARE INVALID.

As this Court found, Plaintiff "does not allege that the acts that occurred prior to October 2012[] constituted actionable discrimination." (Dkt. 33, Pg ID 498.) But to the extent Plaintiff asserts ELCRA claims over her failure to obtain

-11-

the Senior Consultant or Senior Assistant jobs in 2011, those claims fail as a matter of law (these claims were not before the EEOC, and so she has no valid Title VII claims for these allegations, *see* Dkt. 23, Pg ID 241-42; Dkt. 29, Pg ID 374-75).

*First*, Plaintiff's lack of qualifications prevents her from establishing a *prima facie* case as to either job. *Williams*, 819 F.2d at 629; *Wooden*, 931 F.2d at 378. Both jobs were audit positions, and they required experience with a public accounting firm—three years for the Senior Consultant job, and one year for the Senior Assistant job. (*Supra* at 5.) Plaintiff's resume does not reflect audit experience or the required experience with a public accounting firm. (*Id.* at 5, 6.)

*Second*, there can be no *prima facie* inference of discrimination as to either job because Plaintiff's resume did not reflect—and the resume screeners did not know—Plaintiff's race or age, and four out of the seven candidates hired between the two jobs were women. (*Supra* at 6.) These are not circumstances that give rise to an inference of discrimination. *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 80-81 (2d Cir. 2005) (holding plaintiff cannot establish ADEA claim if decision-maker unaware of her age); *Johnson v. N.W. Airlines*, No. 94–1076, 1995 WL 242001, at *3 (6th Cir. Apr. 24, 1995) ("[a]n employer cannot intentionally discriminate against an individual on the basis of race if he is unaware of that individual's race"); *Letner v. Wal-Mart Discount Dep't Store*, 172 F.3d 873, 1999

-12-

WL 68766, *4, *6 (6th Cir. 1999) (table decision) (plaintiff could not meet *prima facie* burden where better-treated comparators were half men, half women).

## II. PLAINTIFF'S CLAIMS REGARDING THE OCTOBER 2012 ENTRY-LEVEL HIRING DECISION FAIL AS A MATTER OF LAW

Plaintiff's Third Amended Complaint claims that Deloitte's failure to hire her for the entry-level audit position in October 2012 was due to her race, sex, and age. In fact, Deloitte's hiring practices resulted in a class of ten racially-diverse candidates[6] (including an African-American woman), half of whom were women. Plaintiff's interviewers did not know her age, and one of the candidates for this entry-level job was 34—not significantly younger than Plaintiff, who was 41. (*See* Ex. 16 ¶ 6; Ex. 17 ¶ 7; Ex. 18 ¶ 8; Ex. 20, Gorski Dep. at 6.) Plaintiff's theories as to why the failure to hire her was nonetheless discriminatory are meritless.

### A. Plaintiff Has No Direct Evidence of Discrimination

Plaintiff first asserts that two vague, ambiguous hearsay statements—both allegedly made after the Fall 2012 hiring season—are evidence of discrimination: (1) that campus recruiter Upshaw told Plaintiff that the "decision makers" thought Plaintiff was not a "good fit" for the job; and (2) that Arica Harris told Plaintiff that an unidentified "they" were concerned that she would not be able to work for a younger manager—a statement that Harris allegedly heard from Upshaw, who

---

[6] As discussed *supra* at 10 n.5, the eleventh hired candidate (Ko Yamamoto) is not comparable since he was hired into the Japanese Services Group, not audit.

allegedly heard it from "Deloitte." (Ex. 11 at 121-23, 225-26, 365-66; *id.* at 114-18, 370-71.) Even if it were proper to consider these statements, these vague and ambiguous statements do not, standing alone, constitute direct evidence for purposes of a *prima facie* case. *See Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 382 (6th Cir. 2002). In any event, such "hearsay evidence cannot be considered on a motion for summary judgment," *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994), and no hearsay exception applies.

At the outset, use of the phrase "good fit" is not, itself, direct evidence of discrimination. As the Seventh Circuit held recently, statements "such as 'better fit' or 'fitting in' are not necessarily about race or discriminatory," and it noted that many "courts have used the phrase 'better fit' in describing legitimate, nondiscriminatory reasons for a hiring decision adverse to the plaintiff." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, No. 14-2269, 2015 WL 1046733, at *7 (7th Cir. Mar. 11, 2015). Here, Plaintiff admits that she did not ask Upshaw what she meant by "good fit," and even today does not know what Upshaw meant. (Ex. 11 at 121, 225-26.) There is no basis, apart from speculation, to assume that the alleged comment "good fit" related to Plaintiff's race, gender, or age. It is thus irrelevant.

It is also inadmissible hearsay. The case of *Back v. Nestle U.S.A.*, 694 F.3d 571 (6th Cir. 2012) is directly on point. There, the plaintiff's co-worker gave an affidavit stating that the defendant's HR Director had told him that "higher

-14-

management" said it had a plan to terminate older employees. *Id.* at 577. As hearsay within hearsay, each part of the statement needed to be admissible under a hearsay exception. *Id.* The HR Director's alleged statement to the co-worker would have been admissible as the statement of a party opponent under FRE 801(d)(2)(D). *Id.* But the plaintiff could not prove that the second level of hearsay—the alleged statement by "higher management" to the HR Director—fell within a hearsay exception because plaintiff had no "evidence that the unidentified declarants were speaking on a matter within the scope of their employment." *Id.* at 577-78. The hearsay statement itself could not, as a matter of law, provide evidence that the hearsay exception applied. *Id.* And while, ordinarily, the identity of the person testifying as to the hearsay can provide such evidence (for example, an HR Director whose job makes him privy to higher-management statements), the HR Director was *not* the affiant in that case; it was plaintiff's co-worker. The co-worker would not have been privy to conversations by higher management, and so his identity did not provide any assurances as to the trustworthiness of the second-level hearsay statement. *Id.* The entire statement was thus held inadmissible. *Id.*

Plaintiff's hearsay statements are inadmissible for the same reasons. The source of the "good fit" statement is Plaintiff herself; Upshaw did not testify that she made such a statement. (Ex. 5 at 97:13-98:5). Just as in *Back*, the alleged statement by "decision-makers" is double-hearsay: Plaintiff is repeating Upshaw's

-15-

alleged out-of-court statement (hearsay level one) that "decision-makers" told Upshaw that Plaintiff was not a "good fit" (hearsay level two.)[7] And as in *Back*, the alleged hearsay statement itself is not evidence that unidentified "decision makers" made a statement within the scope of their authority, nor does such evidence come from Plaintiff's identity—as a job applicant, she is not privy to Deloitte's hiring decisions. 694 F.3d at 578. The statement is inadmissible.

The Harris statement regarding Plaintiff working for a "younger manager" is inadmissible for the same reason. The source of this alleged statement is Plaintiff; Harris denied making it. (Ex. 15 at 19, 92-94). If Plaintiff testifies to the statement, it is triple hearsay, running from "Deloitte" to Upshaw to Harris to Plaintiff. Under *Back*, neither the statement itself, nor Plaintiff's identity as the speaker is evidence that someone at "Deloitte" made a statement within the scope of their authority.

The Harris statement is also inadmissible for a second reason: Harris's *own* statement in the hearsay chain does not qualify as the statement of a party-opponent under Rule 801(d)(2)(D) because Detroit audit hiring is not within the scope of Harris's authority. *See Back*, 694 F.3d at 577. Harris was not in the audit department; she was in Enterprise Risk Services in St. Louis, and taught ERS

---

[7] Since Upshaw herself had no role in deciding which interviewees would receive offers, if *she* originated the phrase "good fit," it would not be evidence of discrimination by Deloitte's decision-makers. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 239 (6th Cir. 2005). It is only Plaintiff's attribution of the phrase to "decision makers" that gives it any conceivable probative value.

employees there. (Ex. 15 at 7-8.) Her only link to audit recruiting was her general ability to obtain a referral bonus for identifying candidates. (*Id.* at 7-8, 52.) There is no evidence to suggest that statements by Harris about audit hiring decisions— let alone in Detroit—would have been made in the scope of her work duties.

**B.     Plaintiff Has No Circumstantial Evidence of Discrimination.**

As noted, half of the ten entry-level candidates hired in October 2012 were women, the group was racially diverse (including an African-American woman), and included a 34-year old. (*Supra* at 13.) Under these circumstances, Plaintiff cannot establish a *prima facie* case, as these facts undercut an inference of race, sex, or age discrimination.[8] Even if she could, Deloitte's decision not to hire Plaintiff due to her interview scores does not constitute pretext for discrimination.

**1.     Deloitte's Selection of Candidates Based on Interview Scores is a Legitimate, Non-Discriminatory Practice**

An employer's use of job interviews in hiring—a commonplace practice for professional employment—is a legitimate, non-discriminatory basis for choosing among candidates. *See, e.g.*, *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619 (6th Cir. 2003) (holding that "decision to offer [a] position" because candidate

---

[8] *See, e.g.*, *Ortiz v. Hershey Co.*, 580 F. App'x 352, 353, 357 (6th Cir. 2014) (where co-workers receiving "better treatment" included member of plaintiff's racial group, record did "not give rise to any reasonable inference of racially disparate treatment by [defendant]"); *Letner*, 1999 WL 68766 at *6; *Woodman*, 411 F.3d at 80; *Grosjean v. First Energy Corp.*, 349 F3d 332, 338-40 (6th Cir. 2003) (generally, "age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case.")

"achieved an overall higher score than [plaintiff] on the interviews" is a legitimate, non-discriminatory reason for an employment decision); *Reid v. Mich. Dep't of Corr.*, 101 F. App'x 116, 120 (6th Cir. 2004) (holding poor interview performance non-discriminatory reason for failure to promote); *cf. Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006) (existence of evaluation criteria that require subjective judgments are, standing alone, "irrelevant to the pretext inquiry").

Plaintiff's interview performance was the reason that she was not selected for an offer, and the record is replete with evidence confirming this reason. Plaintiff undisputedly received an aggregate interview score of 8—near the bottom of all of the entry-level candidates. Her interviewers—Leslie Fischer, Julie Wahrman, and Brad Stevenson—all echoed a consistent theme: Plaintiff provided short, undetailed answers to their interview questions, and Plaintiff was unable to engage in a robust, back-and-forth conversation about her past experiences. (*Supra* at 7-9.) Given that an auditor is expected to work closely with clients and possess strong communication skills, all three interviewers found this aspect of Plaintiff's interview performance concerning. (*Id.*; *see also* Ex. 1 ¶¶ 6-9; *Doster v. Harvey*, 2005 WL 3501410, at *3-4 (E.D. Mich. Dec. 21, 2005) (holding that candidate's providing "very brief answers that did not deal with the 'meat' of the questions" in interview is a legitimate basis for low score)).

Stevenson and Fischer also state that Plaintiff gave lackluster answers to their questions. (*Supra* at 7, 9.) Wahrman did not recall that the content of Plaintiff's answers was weak, but that is not problematic, even if one assumed that each interviewer had asked identical questions. As the Sixth Circuit has explained:

> The fact that one interviewer might have disagreed with the evaluation of an answer accorded by another interviewer is not evidence that either based his or her evaluation on anything other than his or her honest assessment of the answer. Rather, it simply indicates that the two individuals disagree as to subjective factors, which one would expect might happen from time to time. Indeed, it is because we expect individuals to disagree with respect to subjective factors that we frequently employ more than one individual to evaluate subjective criteria, as the [defendants] did here.

*Sutherland*, 344 F.3d at 619.

Plaintiff's own testimony about one of Stevenson's questions corroborates his concerns. Stevenson asked Plaintiff how she managed "difficult teammates or teammates that weren't carrying their load." (Ex. 11 at 189.) Plaintiff said that she once had a Walsh classmate who did not pull her weight. (*Id*.) Stevenson had to specifically prompt her to provide more details (*id.* at 190:4-6), and Plaintiff said that she had met with her classmate and asked her to submit her part of a team project in timely fashion. (*Id.* at 190:6-9.) Stevenson *again* had to prompt Plaintiff for more details, asking if Plaintiff's actions resolved the issue. (*Id.* at 190:9-10.) Plaintiff told him that, in fact, she had not resolved the situation, the teammate did not change her behavior, and that the rest of the team had to pick up the slack. (*Id.*

at 190:10-23.) She further admitted that, although she had experience working with external auditors at Benesys, she did not describe to Fischer details about those experiences because Fischer did not specifically ask. (*Id.* at 176.)

In other words, Plaintiff's own testimony is that rather than recounting a full answer to Stevenson's behavioral question on teamwork, she gave clipped answers, had to have details dragged out of her, and told Stevenson that she had failed to resolve her problem with her difficult teammate—none of which is reflective of a good interview performance. (Ex. 1 ¶ 9; Ex. 18 ¶¶ 6-7.) And, instead of crafting a well-thought out answer explaining how her past experience on the "other side" of the auditing process might relate to the entry-level audit job she was seeking, Plaintiff stood mute because she was not specifically pressed for details. (*See* Ex. 16 ¶¶ 4-5.) The non-discriminatory reasons for Deloitte's not hiring her—her interview performance—are amply established in the record.

### 2.   Plaintiff Has No Evidence that Deloitte's Interview Scoring Is False and Pretext for Discrimination

Although Deloitte's hiring decisions were based on interview performance, Plaintiff's objections do not appear to be based on the interview itself. She concedes that she has no complaints with her interviews—not with the questions, the interviewers' tone of voice, or anything else. (*Supra* at 8, 10.) As she is unwilling or unable to factually dispute her relative interview performance, she instead turns to attacks on Deloitte or its procedures—none of which have merit.

*First*, Plaintiff's primary complaint appears to be the very fact that Deloitte interviewed her at all, suggesting that she should have been hired based on her own, self-perceived "credentials." (Dkt. 25, ¶¶ 17-22, Ex. 11 at 316-17.) Indeed, Plaintiff has gone so far as to invent her own matrix of preferred qualifications that omits interview performance and which, unsurprisingly, scores her higher than every other candidate. (Ex. 11 at 322-43; Ex. 24.) Among other things, she believes she is more qualified because she had already graduated, passed the CPA exam, and had worked for several years after obtaining her bachelor's degree—along with her own speculation about the other candidates' criteria. (*Id.*)

However, a plaintiff "cannot rebut an employer's proffered explanation by proposing [her] own rubric of relevant qualifications and testing the employer's conduct against it." *Trapp v. TSS Techs., Inc.*, 485 F. App'x 757, 760 (6th Cir. 2012); *see also, e.g.*, *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987) (holding that the "applicant's perceptions . . . of what qualifications are required for a particular position" are irrelevant). Here, none of Plaintiff's self-selected criteria are qualifications for the job. It is an entry-level position open to applications from students who are still in college; it does not require a CPA license; and the "relevant" work experience is defined to include internships or summer jobs. (Ex. 4, Tab C; Ex. 9 at 11-13.) Plaintiff might have met the paper qualifications for this entry-level job, but she is not *better* qualified because she had already graduated,

had a CPA, or because she had years of work experience—experience that did not qualify her for a senior-level audit position, "credentials" notwithstanding.[9]

*Second,* Plaintiff is not better qualified than the other candidates, even on paper, despite her subjective opinion to the contrary. (Ex. 11 at 322:8-19.) A plaintiff's subjective views of her own qualifications "in relation to other coworkers, without more, are insufficient to establish discrimination." *Schoonmaker v. Spartan Graphics Leasing*, 595 F.3d 261, 268-69 (6th Cir. 2010). Rather, to show pretext based on relative qualifications, the plaintiff's qualifications must be "so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006).

That is not the case here. All ten of the hired audit candidates' resumes reflected strong academic credentials and work experiences. (Ex. 4, Tab K & Ex. 19). All had or were obtaining an accounting degree, with most in master's programs. (*Id.*) All of them had work or internship experience with some connection to tax, accounting, audit, finance, business, or the like, including many with public accounting firms. (*Id.*) And while grade point average is not an apples-

---

[9] *Cf. Spaeth v. Georgetown Univ.*, 943 F. Supp. 2d 198, 209 & n.4 (D.D.C. 2013) (holding that when entry-level tax professor job did not call for extensive work experience, attorney with decades in the tax field was not "significantly better qualified" than candidates a few years out of law school).

to-apples comparison between different schools and professors, all ten Audit Practice hires had a better GPA than Plaintiff in either their undergraduate or graduate program—and, in some cases, both. (Ex. 19.) Even on paper, Plaintiff was not "so significantly better" than the rest of the candidates—and certainly not given her weaker interview scores.

*Third*, Plaintiff complains about the marks she received on the "interview assessment" forms, including Brad Stevenson and Leslie Fischer's not giving her a mark of "strong competency" in technical skills based on her passing the CPA exam.[10] (Ex. 11 at 316; *see also, e.g.*, Ex. 9 at 46.) This argument misapprehends the purpose of the candidate interview assessment form—it is a vehicle for taking notes on the interview; it is not a survey form to be filled out in detail with information from a resume, and it is neither expected nor required that every blank and checkbox be filled out.[11] (Ex. 5 at 77-80, Ex. 7 at 56-58, 68-69; Ex. 9 at 47-49, 72). It is likewise not used to decide who receives offers—that occurs the consensus meeting immediately following the interview sessions. (Ex. 5 at 78-79,

---

[10]Julie Wahrman's candidate interview assessment form was apparently misplaced and is not in Deloitte's records. (Ex. 10 at 52-53.) There is no dispute, however, that Wahrman gave Plaintiff an interview score of "2" (the highest of all Plaintiff's interviewers), and although Plaintiff's counsel has insinuated impropriety (*id.* at 59-60), there is no evidence supporting such an accusation.

[11] The second-round assessment forms for the hired candidates are not appreciably different from Plaintiff's with respect to the amount of notes taken. Very few interviewers wrote more than Stevenson and Fischer, and some wrote less. (Ex. 4, Tab N.)

86-87, 96-97; Ex. 7 at 56-57; Ex. 9 at 91). Thus, as to the CPA issue, it is unlikely that an interviewer would note anything on the form unless the CPA or technical skills were emphasized in the interview.[12] (Ex. 7 at 38, 45; Ex. 9 at 46-50, 79-80.)

Plaintiff's dissatisfaction with the contents of her interview form ultimately misses the point. The issue is not whether Plaintiff should have been given appropriate "credit" for her CPA or for her other perceived credentials; that is just a variation on Plaintiff's argument that paper credentials should have controlled. The issue is whether Plaintiff relayed her experiences during the interview in a way that showed judgment, strong communications skills, teamwork, and the like. Her quibbles over the form do not show that her interview performance was in fact better than the hired candidates, nor do they prove that her interviewers' concerns over her "soft skills" or quality of her answers were so erroneous that a fact-finder could reasonably cast doubt on the interviewers' honesty. *See Bender*, 455 F.3d at 627. The notes are not pretext evidence.

*Fourth*, Plaintiff suggests there is evidence of racial discrimination based on the racial makeup of Deloitte's workforce. (Ex. 11 at 283.) But under Sixth Circuit

---

[12] Neither Stevenson nor Fischer gave *negative* remarks on Plaintiff's "technical skills"—Stevenson noted that there was insufficient evidence from the interview to make an assessment, and Fischer left it blank. (Ex. 7 at 41; Ex. 9 at 79.) At best, Stevenson and Fischer agreed that passing the CPA exam might show some technical skill. (Ex. 7 at 40-45; Ex. 9 at 46.) It is not clear how Plaintiff believes that her interviewers' failure to regurgitate something from her resume into their interview notes negates the fact that she performed comparatively poorly with questions designed to assess the necessary non-technical skills for the job.

law, a plaintiff cannot raise an inference of pretext based on disproportionate employment rates without (1) statistically significant evidence that rules out the possibility of chance *and* (2) "independent circumstantial evidence of discrimination." *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437 (6th Cir. 2002). Plaintiff has not even named an expert witness, let alone provided an expert report identifying statistically-significant racial disparities in Deloitte's Detroit office that cannot be attributed to chance. Nor, as explained above, is there any circumstantial evidence of racial discrimination to accompany the (non-existent) statistical evidence. Plaintiff cannot establish pretext based on this record. *See Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 359 (6th Cir. 2012) ("inconclusive statistical data unaccompanied by any expert analysis" insufficient for pretext showing).

## CONCLUSION

The motion for summary judgment should be granted.

KIENBAUM OPPERWALL HARDY
 & PELTON, P.L.C.

By:/s/Thomas J. Davis
   Elizabeth Hardy (P37426)
   Thomas J. Davis (P78626)
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@kohp.com
Dated: March 27, 2015     tdavis@kohp.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2015, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following: ajennings@edwardsjennings.com; Duncan@iabattorneys.com and I hereby certify that I have caused to be served via U.S. mail the foregoing document to the following non-ECF participants:

(no manual recipients)

/s/Thomas J. Davis
280 North Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
Email: tdavis@kohp.com
(P78626)